*277*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

STATE TREASURER OF THE STATE OF
MICHIGAN, AS CUSTODIAN OF THE
MICHIGAN PUBLIC SCHOOL
EMPLOYEES RETIREMENT SYSTEM,
STATE EMPLOYEES' RETIREMENT
SYSTEM, MICHIGAN STATE POLICE
RETIREMENT SYSTEM AND
MICHIGAN JUDGES RETIREMENT
SYSTEM

                       Plaintiff,

    v.

TYCO INTERNATIONAL, LTD.,
COVIDIAN LTD., TYCO ELECTRONICS
LTD., L. DENNIS KOZLOWSKI, MARK
H. SWARTZ, MARK A. BELNICK,
FRANK E. WALSH, JR.,
PRICEWATERHOUSECOOPERS  AND
PRICEWATERHOUSECOOPERS, LLP,

                   Defendants.

·Case: 2:08-cv-10578
Judge: Rosen, Gerald E
Referral MJ: Scheer, Donald A
Filed: 02-08-2008 At 12:32 PM
CMP STATE TREASURER V TYCO INTL (RR
H)

**COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.     SUMMARY OF CLAIMS ..................................................................................... 1

II.    JURISDICTION AND VENUE ........................................................................... 5

III.   THE PARTIES ..................................................................................................... 5

       A.    Plaintiff .................................................................................................... 5

       B.    Defendants ................................................................................................ 5

             1.    The Tyco Defendants ..................................................................... 9

             2.    The PWC Defendants .................................................................... 11

IV.    DEFENDANTS' FRAUDULENT SCHEME ..................................................... 12

       A.    Looting Of Tyco And The Non-Disclosures Concerning That Conduct ............ 12

             1.    Undisclosed "Finder's Fee" ........................................................... 12

             2.    Undisclosed Compensation Paid To The Officer Defendants ................ 15

                   a.    Defendants' Failure to Disclose "Relocation" Compensation ...... 16

                   b.    Defendants' Failure To Disclose The Unauthorized TyCom Loan
                         Forgiveness Plan ................................................................. 19

                   c.    Defendants' Failure To Disclose The Unauthorized ADT
                         Automotive Bonuses ............................................................ 22

                   d.    Defendants' Failure To Disclose The Flag Telecom
                         Compensation ..................................................................... 23

                   e.    Defendants' Failure to Disclose the "KEL" Loans As
                         Compensation ..................................................................... 25

                   f.    Defendants' Failure to Disclose Belnick's Compensation .......... 27

                   g.    Defendants' Failure To Disclose The Belnick Retention
                         Agreement .......................................................................... 31

                   h.    Defendants' Failure To Disclose The Additional Unlawful
                         Compensation Paid To Kozlowski And Swartz By Tyco .......... 33

             3.    Defendants' Affirmative Misrepresentations Concerning The Officer
                   Defendants' Compensation ............................................................. 37

                   a.    Defendants' Representations Concerning The Officer Defendants'
                         Compensation For The Period Ended September 30, 1999 .......... 37

                   b.    Defendants' Representations Concerning The Officer Defendants'
                         Compensation for the Period Ended September 30, 2000 ........... 39

                   c.    Defendants' Representations Concerning The Officer
                         Defendants' Compensation for the Period Ended September 30,
                         2001 .................................................................................. 42

                   d.    Defendants' Additional Representations Concerning The KEL
                         Loans Taken By Kozlowski And Swartz .................................. 45

i

B.   The Significant Role Played By The PWC Defendants In The Tyco Defendants' Unlawful Conduct ............................................................................................. 47

C.   Defendants' Failure To Disclose The Officer Defendants' Criminal Conduct .. 48

D.   Defendants' Fraudulent Accounting Practices .................................................... 53

1.   Improper Accounting Practices That Inflated Tyco's Reported Financial Results During the Relevant Time Period ................................................. 53

   a.   The Improper Accounting Related to ADT ................................. 57

   b.   Tyco Improperly Employed Acquisition-Related Accounting Entries To "Spring-Load" Tyco's Reported Financial Results... 62

   c.   Improper Accounting Entries That Inflated Tyco's Reported Financial Results ............................................................................ 63

   d.   Additional Improper Accounting Practices Demonstrating Defendants Scienter................................................................... 73

2.   Defendants' False And Misleading Statements Concerning Tyco's Accounting Practices And The Integrity Of Tyco Management ............ 75

3.   Defendants' Materially False And Misleading Representations Concerning Tyco's Liquidity.................................................................... 83

4.   Materially False And Misleading Representations Made By Defendants Concerning Tyco's Financial Results....................................................... 89

   a.   Defendants' Materially False And Misleading Statements Concerning The Company's Financial Results For The Fiscal Quarter and Year Ended September 30, 1999 ............................ 90

   b.   Defendants' False And Misleading Statements In The December 1999 S-8................................................................................... 93

   c.   Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended December 31, 1999................................................................... 93

   d.   Defendants' Materially False And Misleading Statements In The December 1999 S-4 And Its Related SEC Filings ...................... 96

   e.   Defendants' Material Misrepresentations And Omissions In The January 2000 S-8 .................................................................... 97

   f.   Defendants' Materially False And Misleading Statements Concerning Tyco's Results For The Quarter Ended March 31, 2000 ...................................................................................... 97

   g.   Defendants' Materially Misleading Representations And Omissions In The Mallinckrodt Transaction SEC Filings ........ 100

   h.   Defendants' Material Misrepresentations And Omissions In The 2000 Euro Offering SEC Filings................................................ 101

   i.   Defendants' Materially False And Misleading Representations In The December 2000 TIGSA Prospectus.................................... 104

j.      Defendants' False And Misleading Statements Concerning The Company's Financial Results For The Quarter Ended June 30, 2000 ........................................................................................... 105

k.     Defendants' Materially False And Misleading Representations In Tyco's August 2000 Registration Statements And Related SEC Filings ....................................................................................... 107

l.      Defendants' False And Misleading Statements Concerning The Company's Financial Results For The Fiscal Quarter And Year Ended September 30, 2000 ........................................................ 110

m.    Defendants' Materially False And Misleading Representations In The October 2000 S-8 ................................................................. 113

n.     Defendants' Materially False And Misleading Representations In The November 2000 S-4/A ...................................................... 113

o.     Defendants' Materially False And Misleading Statements In The November 2000 S-3 And Its Amendment ................................. 114

p.     Defendants' Materially False And Misleading Representations In The December 2000 S-3 And Related SEC Filings .................. 116

q.     Defendants' Materially Misleading Representations And Omissions In The January 2001 S-8 .......................................... 118

r.      Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Quarter Ended December 31, 2000..................................................................... 119

s.      Defendants' Materially False And Misleading Statements In The February 2001 S-4 And Related SEC Filings............................ 121

t.      Defendants' Materially False And Misleading Representations In The March 2001 S-3.................................................................... 121

u.     Defendants' Materially False And Misleading Representations In The March 2001 CIT S-4 And Related SEC Filings................. 122

v.     Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Quarter Ended March 31, 2001........................................................................... 123

w.    Defendants' Materially False And Misleading Representations In The June 2001 S-8 ...................................................................... 125

x.     Defendants' Materially False And Misleading Representations In The July 2001 S-3 ..................................................................... 125

y.     Defendants' Materially False And Misleading Representations Concerning The Company's Results For The Quarter Ended June 30, 2001 ................................................................................ 125

z.      Defendants' Materially False And Misleading Representations In The August 2001 S-4 And Related SEC Filings ........................ 127

|  |  | aa. | Defendants' Materially False And Misleading Representations In The August 2001 S-3 And Related SEC Filings .......................... 128 |
|  |  | bb. | Defendants' Materially False And Misleading Representations In The October 2001 S-4 And Related SEC Filings....................... 129 |
|  |  | cc. | Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Fiscal Quarter And Year Ended September 31, 2001 ............................................... 131 |
|  |  | dd. | Defendants' Materially False And Misleading Representations In The January 2002 S-4 And Its Amendment ............................... 133 |
|  |  | ee. | Defendants' Materially False And Misleading Representations Concerning Tyco's Results For Quarter Ended December 31, 2001 ........................................................................................... 134 |
|  |  | ff. | Defendants' Materially False And Misleading Representations Concerning The Company's Financial Results For The Quarter Ended March 31, 2002 .................................................................. 136 |

|  | E. | False Representations Made By The PWC Defendants .................................... 138 |
|  | F. | Violations Of GAAP And GAAS ..................................................................... 142 |
|  | G. | Effects Of Defendants Fraudulent Accounting Practices.................................. 151 |
|  | H. | The Materially False And Misleading Guidance To Analysts Delivered By Kozlowski And Swartz........................................................................................ 156 |
|  | I. | Kozlowski's And Swartz's Material Misrepresentations Concerning Their Sales Of Tyco Stock...................................................................................................... 158 |
|  | J. | Defendants' Material Omissions........................................................................ 159 |

| V. | | THE IMPACT OF DEFENDANTS' UNLAWFUL CONDUCT ON TYCO INVESTORS ................................................................................................................ 160 |
| VI. | | DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS AND OMISSIONS CAUSED PLAINTIFF'S ECONOMIC LOSS............................................................... 162 |
| VII. | | PLAINTIFF RELIED UPON DEFENDANTS' REPRESENTATIONS...................... 169 |
| VIII. | | ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THAT DEFENDANTS ACTED WITH SCIENTER .......................................................... 172 |
|  | A. | The Tyco Defendants Have Admitted Numerous Facts That Demonstrate That They Acted With Scienter................................................................................... 172 |
|  | B. | The Tyco Defendants Had Motive And Opportunity To Commit The Fraudulent Acts Alleged Herein.......................................................................................... 175 |
|  | C. | The Tyco Defendants' Access To The Adverse Information Concerning The Company's Operations Supports A Strong Inference That They Acted With Scienter............................................................................................................. 182 |
|  | D. | Defendants' Efforts To Conceal Their Conduct Demonstrate Scienter............ 193 |

E.     Defendants Either Knew Or Were Reckless In Not Knowing That Tyco's Financial Controls Were Grossly Inadequate...................................................... 200

F.     Defendants Either Knew Or Were Reckless In Not Knowing That Tyco's Management Encouraged The Manipulation Of The Company's Financial Results ........................................................................................................................ 207

G.     Additional Facts That Demonstrate That Walsh And Tyco Acted With Scienter ............................................................................................................................. 208

H.     The PWC Defendants Acted With Scienter ....................................................... 212

    1.     The Facts Found By The SEC Provide Additional Support That The PWC Defendants Acted With Scienter.................................................... 216

    2.     PWC Defendants' Access Further Strengthens The Inference Of Scienter ......................................................................................................... 226

    3.     The PWC Defendants Had Motive And Opportunity To Engage In Fraudulent Conduct ................................................................................. 230

    4.     The PWC Defendants Discovery Of Improper Accounting At Tyco Demonstrates Scienter.......................................................................... 230

    5.     The PWC Defendants' Failure To Comply With Additional GAAP And GAAS Requirements Further Demonstrates Scienter ........................... 231

IX.    NO SAFE HARBOR.......................................................................................................... 233

X.    NEW JERSEY RICO ALLEGATIONS ........................................................................ 233

A.     The RICO Defendants' Pattern Of Racketeering Conduct................................ 234

    1.     Theft And Violations Of Chapter 20 Of Title 2C Of The New Jersey Statutes.................................................................................................... 234

    2.     Fraudulent Practices And Violations Of Chapter 21 of Title 2C of The New Jersey Statutes............................................................................... 236

    3.     Use Of Tyco To Further And Promote Criminal Objects ..................... 237

    4.     Securities Violations .............................................................................. 237

    5.     Mail Fraud and Wire Fraud................................................................... 238

B.     The RICO Defendants' Violations Of The New Jersey RICO Act................... 239

C.     The PWC Defendants' Aiding and Abetting Violations of the New Jersey RICO Act.......................................................................................................................... 240

D.     Plaintiff's Injuries Arising From The RICO Defendants' Violations Of The New Jersey RICO Act............................................................................................. 241

XI.    CAUSES OF ACTION ..................................................................................................... 242

Plaintiff State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges Retirement System, (Plaintiff") through its attorneys, MICHAEL A. COX, Attorney General of the State of Michigan, ROBERT N. KAPLAN, Special Assistant Attorney General, FREDERIC S. FOX, Special Assistant Attorney General, LAURENCE D. KING, Special Assistant Attorney General, JOEL B. STRAUSS, Special Assistant Attorney General, HAE SUNG NAM, Special Assistant Attorney General, and DONALD R. HALL, Special Assistant Attorney General, alleges the following based upon the investigation conducted by and through its undersigned counsel, except as to those paragraphs relating to Plaintiff or its purchases of the securities of Tyco International, Ltd. ("Tyco" or the "Company"). Those allegations are alleged upon Plaintiff's personal knowledge. The investigation of Plaintiff's counsel has included, but not limited to, the following: (a) the review and analysis of the filings made by Tyco with the United States Securities and Exchange Commission ("SEC") that are referenced herein; (b) the review and analysis of the Tyco press releases referenced herein; (c) the review and analysis of the newspaper, magazine and other periodical articles: (d) the review and analysis of the pleadings in certain civil litigations, regulatory proceedings and criminal actions brought against the individual defendants; and (e) review of certain testimony delivered in those actions.

## I.   SUMMARY OF CLAIMS

1.    Plaintiff's claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o; Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78r and 78t(a) and the rules and regulations promulgated thereunder, including Rule 10b-5, 17

C.F.R. §240.10b-5; state common law; New Jersey's RICO Statute, N.J.S.A. 2C:41-1. et seq; and Michigan securities law.

2. These claims are a direct result of one of the most sensational accounts of corporate greed and malfeasance in modern history. While Plaintiff invested in what it believed to be a financially solid, responsible public company, Defendants were engaged in a massive fraud, not only designed to line their own pockets, but also to artificially inflate and/or maintain the price of Tyco's publicly traded securities to ensure that Tyco would continue to be their source of ill-gotten riches.[1] As a result, many of Michigan's citizens were directly impacted. The Michigan Retirement Systems invested millions of dollars of retirement funds in Tyco on behalf of over 580,000 Michigan citizens and, due to the massive fraud orchestrated by the Defendants, these retirement systems suffered millions of dollars in losses.[2]

3. Indeed, L. Dennis Kozlowski ("Kozlowski"), Tyco's former Chairman and Chief Executive Officer, was convicted of conspiracy, grand larceny, securities fraud and falsifying business records on June 17, 2005, and is currently serving a prison term of $8^{1}/_{3}$ years to 25 years. Likewise, Defendant Mark Swartz ("Swartz") was convicted of conspiracy, grand larceny, securities fraud and falsifying business records on June 15, 2005 and is currently serving a prison term of $8^{1}/_{3}$ years to 25 years. Defendant Frank E. Walsh ("Walsh") pleaded guilty to securities fraud in December of 2002, and Richard P. Scalzo ("Scalzo"), a partner of PricewaterhouseCoopers LLP ("PWC LLP"), Tyco's independent auditor, was found to have violated Section 10(b) of the Exchange Act in connection with the audit of Tyco's financial results.

---

[1]    "Defendants" refers to each defendant named in Part III.B. herein.

[2]    "The Michigan Retirement Systems" refers to the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System and Michigan Judges Retirement System.

4.      All of the Defendants named herein actively participated in defrauding Tyco shareholders, including Plaintiff. Defendants' fraudulent scheme had multiple interrelated elements, including, the Officer Defendants' improper use of Tyco loan programs as a corporate piggybank for their personal enrichment and the fraudulent reporting of Tyco's financial results.[3]

5.      As a result of this unlawful conduct, certain of the Officer Defendants are serving prison sentences and Tyco has had to restate its financial statements at least three times. The restatements are an admission that Tyco's financial statements were materially false for the period restated.

6.      The fraudulent scheme detailed herein could not have been accomplished had defendants PricewaterhouseCoopers ("PWC-Bermuda") and PWC LLP (collectively, the "PWC Defendants"), Tyco's independent auditors, adequately performed even the most rudimentary audit procedures prior to certifying the financial statements issued by Tyco as compliant with Generally Accepted Accounting Principles ("GAAP"). As Lynn Turner, the former Chief Accountant of the SEC, has stated in discussing the misconduct alleged herein, "[T]his is called fraud... How the hell do you do that and not have PricewaterhouseCoopers find it?"

7.      The PWC Defendants' failure to conduct its audit of Tyco in accordance with its professional responsibilities was acknowledged by the SEC as it found that Scalzo, the PWC LLP audit partner responsible for Tyco, violated the Exchange Act in connection with PWC Defendants' "audit" of Tyco and engaged in improper professional conduct pursuant to Rule 102(e)(1)(ii) of the SEC's Rules of Practice.

---

[3]      "Officer Defendants" refers to Kozlowski, Swartz and Belnick.

8.      When the egregious misconduct committed by Defendants was belatedly disclosed, the price of Tyco stock materially declined causing Plaintiff to suffer huge losses in its investments in Tyco.   Because those damages are the direct and proximate result of Defendants' misconduct, Plaintiff has commenced this action to recover damages and other appropriate relief.

## II.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, because Plaintiff asserts claims arising under Sections 10(b), 18, and 20(a) of the Exchange Act.  In addition, the Court has jurisdiction over this action pursuant to §22 of the Securities Act because Plaintiff asserts claims for violation of §§11, 12(a)(2) and 15 of the Securities Act. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act. Furthermore, a substantial part of the events giving rise to the claim occurred in this District. Defendants issued false statements directed to this District and members of the Michigan Retirement Systems reside in this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of the national securities exchanges. Defendants' actions had a significant impact upon interstate commerce, including causing Plaintiff and other investors to purchase Tyco securities over national securities exchanges and causing Plaintiff to suffer damages when Defendants' unlawful actions were belatedly disclosed.

4

## III.   THE PARTIES

### A.   Plaintiff

12.    Plaintiff, the State Treasurer of the State of Michigan, as Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System and Michigan Judges Retirement System purchased Tyco securities at artificially inflated prices during the Relevant Time Period.[4] The Michigan Retirement Systems cover over 580,000 people, including public school teachers, state police and state judges. One out of every 18 Michigan citizens are members of the Michigan Retirement Systems. The combined assets of the systems total nearly $63 billion.

13.    As a direct and proximate result of its purchases of Tyco securities, Plaintiff has suffered many millions of dollars in damages. Plaintiff purchased Tyco securities at prices that were materially inflated as a result of the misrepresentations, omissions and other unlawful conduct alleged herein. Plaintiff suffered enormous economic losses when the market prices of those securities collapsed following the belated revelation that Defendants had engaged in the unlawful conduct specified herein.

### B.   Defendants

#### 1.   The Tyco Defendants

14.    Defendant Tyco is incorporated in Bermuda. During the Relevant Time Period, Tyco's principal United States subsidiary had its office at 273 Corporate Drive, Suite 100, Portsmouth, New Hampshire and maintained offices in the State of New Jersey. The current headquarters of Tyco's principal United States subsidiary is in Princeton, New Jersey.

---

[4]     "Relevant Time Period" refers to the period December 13, 1999 to June 7, 2002.

15. Tyco is a diversified manufacturing and services company. During the Relevant Time Period, Tyco designed, manufactured and distributed electronic and electrical components, undersea cable communications systems, disposable medical supplies, fire detection and suppression systems, electronic security systems and other products. Tyco's common stock has at all relevant times traded on the New York Stock Exchange ("NYSE") under the ticker symbol TYC.

16. On June 29, 2007, Tyco broke itself up into three entities: Tyco, Covidian Ltd. ("Covidian") and Tyco Electronics Ltd. ("Tyco Electronics").

17. Defendant Covidian is a successor corporation to Tyco. It split from Tyco on June 29, 2007, and began trading as a public company on July 2, 2007. Covidian is jointly and severally liable with Tyco.

18. Defendant Tyco Electronics is a successor corporation of Tyco. It split from Tyco on June 29, 2007, and began trading as a public company on July 2, 2007. Tyco Electronics is jointly and severally liable with Tyco.

19. Defendant Kozlowski was the Company's Chief Executive Officer from July 1993 until June 3, 2002, and Chairman of the Board beginning in July 1997. Kozlowski "resigned" from his positions at Tyco on June 3, 2002 because he was soon to be indicted for tax evasion by the Manhattan D.A. On June 17, 2005, Kozlowski was convicted of conspiracy, grand larceny, securities fraud and falsification of business records and is currently serving a prison sentence of $8^1/_3$ years to 25 years, and was ordered to pay an individual fine of $70 million and restitution to Tyco of $97 million. Kozlowski's conviction and sentence were upheld by the Appellate Division of the New York Supreme Court on November 15, 2007.

20. Defendant Belnick was Tyco's Executive Vice President and Chief Corporate Counsel from 1998 through June of 2002. In June 2002, he was fired because he refused to

6

cooperate with an internal Tyco probe into the looting by Kozlowski and the other officer defendants. On the day of Belnick's termination, John Fort, III, ("Fort"), Tyco's acting CEO, arrived at Belnick's office with two security guards and told Belnick he had two minutes to leave the building with nothing other than his briefcase. According to Belnick's trial testimony, Fort told him, "You know what the issues are." After Belnick's termination, Tyco revealed that, during Belnick's tenure as Tyco's highest-ranking legal officer, he received tens of millions of dollars in unauthorized compensation in connection with the unlawful conduct alleged herein.

21.     Defendant Swartz was Tyco's Executive Vice President and Chief Financial Officer from 1995 through September of 2002. Swartz left Tyco as a result of his participation in the unlawful schemes developed by Defendants to enrich themselves at the expense of Tyco shareholders. Indicted along with Kozlowski, Swartz was tried on criminal charges in New York County. The first criminal trial resulted in a mistrial but, on retrial, Swartz was convicted of grand larceny, conspiracy and securities fraud and falsification of business records. On September 19, 2005, Swartz was sentenced to a $8\frac{1}{3}$ years to 25 years, and ordered to pay an individual fine of $35 million and restitution to Tyco of $37.6 million . Swartz's conviction and sentence was affirmed by the Appellate Division of the New York Supreme Court on November 15, 2007.

22.     Defendant Walsh was a Tyco director from 1997 through February 2002, during which time he also became the "Lead Director" of Tyco's Board. He was also a director of a predecessor of Tyco from 1992 to 1997. Walsh was involved in an unlawful scheme pursuant to which the Officer Defendants agreed to pay Walsh a $20 million fee for performing the limited "service" of introducing Kozlowski to an executive of an acquisition candidate, The CIT Group ("CIT"). As a result, he was forced to resign from the Tyco Board. Walsh is also a

certified public accountant and was a member of the Tyco Compensation Committee from 1996 through 2000.

     23.    By virtue of their roles as members of the Board and/or as the Company's highest-ranking executives, defendants Kozlowski, Swartz, Belnick, and Walsh, were "control persons" of Tyco as that term is utilized in Section 20(a) of the Exchange Act. These defendants are collectively referred to as the "Individual Defendants."

     24.    Defendant Kozlowski was able to exercise control over Tyco's operations because he was the Company's highest-ranking executive. As a result, Kozlowski served as the Company's primary voice in all press releases and interviews and actively participated in the day-to-day management of Tyco's affairs.  He was also principally responsible for making decisions regarding the compensation received by the Individual Defendants.

     25.    Defendant Belnick was able to exercise control over Tyco's operations because he was the Company's Chief Corporate Counsel at the time of Defendants' material misrepresentations and omissions and other unlawful conduct.  In that role, Belnick was directly involved in all aspects of the day-to-day management of Tyco's affairs and the misconduct alleged herein.

     26.    Defendant Swartz was able to exercise control over Tyco's operations because he was the Company's highest-ranking financial officer during the Relevant Time Period.  As a result, he was intimately involved in all aspects of the day-to-day management of Tyco's operations. Swartz also prepared the Company's false and misleading financial statements, participated in the drafting of the Company's financial disclosures, supervised and drafted material portions of the Company's SEC filings and signed certain of the SEC filings described herein.

27.     As Tyco's "Lead Director," Walsh served as the primary liaison between Tyco's management and the Company's independent directors.  Walsh also served as a member of the Board's Corporate Governance, Nominating and Compensation Committees.  Through these various positions, Walsh was actively involved in the management of Tyco and had the ability to exercise control over Tyco's operations.

28.     Tyco and the Individual Defendants  are collectively referred to herein as the "Tyco Defendants."

29.     The issuance of the false, misleading and incomplete information concerning Tyco that was conveyed to Plaintiff and other investors in Tyco securities resulted from the collective actions of the Tyco Defendants.  The Tyco Defendants served as the Company's public spokespersons, participated in drafting, reviewing and disseminating the false and misleading statements and information alleged herein, oversaw the Company's accounting policies and procedures and were aware of the material adverse facts that rendered those statements false and misleading.

### 2.     The PWC Defendants

30.     Defendant PWC-Bermuda is an accounting firm based in Hamilton, Bermuda. PWC-Bermuda is a member of PricewaterhouseCoopers International, a "membership company" based in the United Kingdom.  In conjunction with PWC LLP, PWC-Bermuda conducted the audits of Tyco's year-end financial statements for the 1999 to 2001 fiscal years. PWC-Bermuda signed the clean audit opinions affixed to each set of those financial statements.

31.     Defendant PWC LLP is an accounting firm based in the United States, with its principal place of business located at 1177 Avenue of the Americas, New York, New York 10036, and regional offices located throughout the country.

32.    PWC LLP performed the overwhelming majority of Tyco's audit work for Tyco's financial statements for the 1999 to 2001 fiscal years.

33.    Tyco has also acknowledged in the following SEC filings, among others, that PWC LLP was the Company's auditor during the Relevant Time Period and was responsible for the issuance of the audit reports provided by the PWC Defendants: the Proxy Statement filed by Tyco with the SEC on February 7, 2003; the 10-Q/A for the quarter ended June 30, 2002 filed by Tyco with the SEC on December 31, 2002; the 10-K filed by Tyco with the SEC on December 30, 2002; and the 10-Q filed by Tyco with the SEC on August 14, 2002.

34.    PWC LLP also acknowledged that it was Tyco's auditor in a February 18, 2002 letter from PWC LLP to Audit Committee Chairman Fort that was attached as an exhibit to a Form 8-K filed by Tyco with the SEC on February 26, 2002. The letter to Fort was signed by Scalzo, a partner in the Boston office of PWC LLP. The Scalzo letter stated:

> As you know, we meet with you and the other members of the Audit Committee periodically to discuss our worldwide audit approach and areas of audit focus for the purpose of our overall annual audit of Tyco International Ltd. ("Tyco" or the "Company"). Our audits of the consolidated financial statements of Tyco as of September 30, 2001 and 2000, and for the three years ended September 30, 2001 comprised audit tests and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. For none of the periods referred to above, or for any other period, did we perform audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of selected transactions, and accordingly, we express no opinion thereon. As a reminder, the financial statements of the Company are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits.
>
> One of the areas of our audit focus on Tyco relates to business combinations. The nature of the procedures that we perform related to any specific business combination is dependent on the nature and materiality of the transaction. Each significant business combination may have unique characteristics, and accordingly we exercise independent judgment as to what audit procedures

related to any specific business combination are necessary to support our audit opinion on the financial statements of Tyco taken as a whole.

35.     In addition, PWC LLP stated in the Form 10-K/A filed by Tyco with the SEC on

December 31, 2002, that the audit report concerning Tyco's financial statements that was

"dated October 18, 2001, except as to Note 31 which is as of December 18, 2001" was issued

by PWC LLP.

36.     Similarly, PWC LLP acknowledged that PWC-Bermuda's audit reports were, in

effect, the opinions of PWC LLP in a Form S-4 Registration Statement filed by Tyco with the

SEC on May 22, 2002. In that SEC filing, PWC LLP explicitly adopted the audit report of

PWC-Bermuda dated October 18, 2001 by stating:

> We hereby consent to the incorporation by reference in this Amendment No. 1
> to the Registration Statement on Form S-4 of Tyco International Ltd. of our
> report dated October 18, 2001, except as to Note 31 which is as of December 18,
> 2001, relating to the financial statements and financial statement schedule,
> which appears in Tyco International Ltd.'s Annual Report on Form 10-K for the
> year ended September 30, 2001. We also consent to the reference to us under
> the heading "Experts" in such Registration Statement.

During Tyco's fiscal 2001, Tyco paid the PWC Defendants more than $51.1 million. Those

payments included at least $37.9 million for consulting, advisory, tax and accounting services

and $13.2 million in auditing fees.

## IV.     DEFENDANTS' FRAUDULENT SCHEME

37.     During the Relevant Time Period, Defendants engaged in an unlawful

conspiracy to enrich themselves at the expense of Plaintiff and other investors by engaging in a

wide variety of misconduct that violated the federal securities laws, the statutes of New Jersey

and Michigan and the common law.

38.     The Tyco fraud encompasses two interrelated parts.   First, senior officers and

directors, including the Individual Defendants, unlawfully looted Tyco for hundreds of

11

millions of dollars and, second, Defendants manipulated Tyco's financial statement to artificially inflate Tyco's financial results.

### A.  Looting Of Tyco And The Non-Disclosures Concerning That Conduct

39.    As a result of the Defendants' pillaging of Tyco:  (a) defendant Walsh pled guilty to violating §352-c(6) of the New York General Business Law, a felony securities fraud statute; (b) Defendants Kozlowski and Swartz were convicted of numerous crimes including securities fraud and are currently serving lengthy prison sentences; and  (c) Defendants' misconduct has been the subject of investigations and/or censure by the SEC, the Committee on Energy and Commerce of the United States House of Representatives, the United States Attorney for the District of New Hampshire and the Bureau of Securities Regulation of the State of New Hampshire.

40.    Tyco has acknowledged the egregious and obvious nature of the Individual Defendants' misconduct.  For example, in an 8-K filed by the Tyco with the SEC on September 17, 2002 (the "September 8-K"), Tyco stated that: Kozlowski, Swartz and Belnick engaged in "improper and unlawful conduct" for over five years; the amount of money stolen by those Defendants was "very large"; and, significantly, the misconduct had harmed Tyco's "reputation and credibility with investors . . . ."

#### 1.    Undisclosed "Finder's Fee"

41.    In early 2001, Walsh proposed that he introduce Kozlowski to the Chairman and CEO of CIT after a discussion at a Tyco Board meeting in which management expressed its interest in purchasing a financial services company.

42.    Following the introduction of Kozlowski and the CIT Chairman facilitated by Walsh, negotiations led to an agreement for Tyco to acquire CIT.  That transaction closed in June of 2001.

43.     After the terms of the CIT transaction had been agreed upon, Kozlowski, Walsh and Swartz agreed that Tyco would pay Walsh a $20 million fee for his role in the transaction. Walsh and the Officer Defendants decided not to disclose that massive fee to investors as was required by SEC rules and regulations.

44.     Defendants deliberately concealed the $20 million payment to Walsh from investors. In the following three SEC filings (the Form S-4 that Tyco filed with the SEC on March 29, 2001, relating to a proposed merger between CIT and a Tyco subsidiary (the "March 2001 CIT S-4"); an amendment to that document on Form S-4/A that Tyco filed with the SEC on April 13, 2001 (the "April 2001 CIT S-4/A"); and a prospectus related to that transaction that Tyco filed with the SEC on April 24, 2001 (the "April 2001 CIT Prospectus")), Tyco failed to disclose the existence of such a payment:

> Except for Lehman Brothers and Goldman, Sachs & Co., the fees and expenses of which will be paid by Acquiror, *there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Acquiror or Guarantor who might be entitled to any fee or commission from Acquiror,* Guarantor or any of their respective affiliates in connection with the transactions contemplated by this Agreement.

(emphasis added).

45.     Moreover, in the Company's 2001 10-K, which was filed with the SEC on or about December 28, 2001, Tyco stated that the following occurred in connection with the CIT acquisition: (a) Tyco Industrial incurred "$29.2 million in acquisition related costs" that "were reflected on Tyco Capital's Consolidated Balance Sheet as a contribution by Tyco in accordance with 'push-down' accounting for business combinations"; and (b) "$22.3 million was paid by Tyco Industrial for acquisition related costs and have been reflected on Tyco Capital's Consolidated Balance Sheet as an additional capital contribution." However, Defendants failed to include the $20 million payment to Walsh as part of the costs associated with the CIT acquisition.

13

46.     Tyco belatedly disclosed the improper payments made to Walsh in a Proxy
Statement filed with the SEC on January 28, 2002 (the "2002 Proxy"). On January 28, 2002,
Tyco shares declined from $42 per share to close at $33.65 per share, or approximately 20%.

47.     After the disclosure on January 28, 2002, in order to ease investors' concerns
about the integrity of Tyco management, the Tyco Defendants continued to mislead investors
concerning the reasons for the enormous payment made to Walsh. Rather than disclosing that
Kozlowski deliberately hid the $20 million payment from the Board and investors, Tyco
asserted that the payment to Walsh was legitimate. According to the January 29, 2002 edition
of *The Wall Street Journal*, Tyco explained:

> Tyco's board decided, without any outside help, that the $20 million payment
> was "appropriate based on the amount of work" Mr. Walsh did, which she said
> included providing guidance, advice and facilitating meetings.

A Tyco press release of that same date quoted defendant Kozlowski as saying, "The Board felt
that fee was appropriate in light of Mr. Walsh's efforts." None of the Defendants corrected
these false and misleading statements.

48.     On December 17, 2002, the SEC filed a civil action in the Southern District of
New York, alleging that Walsh violated the federal securities laws by signing a Tyco
registration statement that failed to disclose his $20 million finder's fee.

49.     Walsh was also indicted by the Manhattan D.A.'s office for, among other
offenses, violating §352-c(6) of the New York General Business Law. That statute makes it
unlawful to engage in securities fraud. On December 17, 2002, Walsh pled guilty to violating
that felony statute. Thus, Walsh has already admitted that he intentionally engaged in securities
fraud.

50.     In connection with that guilty plea, Walsh was required to repay the $20 million
that he unlawfully pilfered from Tyco, to pay a $2.5 million fine, to resign from all of the boards

of directors of public companies on which he sat and to enter a consent decree with the SEC that barred him from serving on for-profit boards of directors.

51.     During his allocution, Walsh admitted that the fee that he received from Tyco was for providing "investment banking or finder's" services. He stated that he "intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that [he] stood to receive a substantial fee if the transaction was approved."

52.     Walsh also admitted that, "[f]ollowing the Board's approval, a securities filing was done by Tyco in which the Company omitted to disclose that I was to get a fee. That made the filing false."

### 2.     Undisclosed Compensation Paid To The Officer Defendants

53.     Pursuant to applicable disclosure principles and SEC regulations, including FASB Statement No. 57 and SEC Regulation S-X, Defendants were required to make detailed periodic disclosures to investors concerning all compensation paid to Tyco's directors and officers, any loans made to those persons and other related-party transactions between Tyco and those executives and directors.

54.     Among other information concerning such transactions, Defendants were obligated under FASB Statement No. 57 to set forth:

> A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

55.     Among other matters, Defendants made materially false and misleading disclosures or omitted material facts concerning: (a) unauthorized payments made in connection with Tyco relocation loan programs; (b) unauthorized loans extended in connection with Tyco loan forgiveness programs; (c) unauthorized use of Tyco's Key Employee Loan ("KEL") program; (d) unauthorized bonus programs relating to Tyco's acquisition and sale of

other companies; and (e) other unlawful compensation and personal benefits paid to the Officer Defendants.

### a. Defendants' Failure to Disclose "Relocation" Compensation

56.     In the September 8-K, Tyco stated that "certain executive officers used the relocation program to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation, enriching themselves with no colorable benefit to Tyco."

57.     SEC regulations require companies to disclose loans to senior executives that amount, in aggregate, to over $60,000. Those regulations mandated that Defendants disclose the "relocation loans" described herein in Tyco's SEC filings. Defendants failed to fulfill those obligations.

58.     The use of "relocation loans" began in March of 1995, when Kozlowski and Swartz initiated a "relocation program" to serve Kozlowski's desire to move his offices from Exeter, New Hampshire to Manhattan.

59.     Kozlowski initially proposed a relocation program that would only have benefitted five or six Tyco executives. As designed, Tyco would have been required to disclose the plan to shareholders as compensation paid to those executives. Accordingly, the Company adopted a broader relocation program that was designed not to discriminate in favor of the Company's officers and directors. This program was approved by the Tyco Board.

60.     However, Kozlowski implemented a different, more generous relocation plan, tailored to the individual circumstances of five or six executives and one assistant (the "New York Plan"). The unauthorized New York Plan permitted reimbursement of school tuition and provided for "gross-up" payments of additional compensation to offset the taxes due on imputed income from the program.

16

61.     After Tyco's 1997 reverse merger with ADT Ltd., a company that conducted its U.S. operations from Boca Raton, Florida, Kozlowski and Swartz adopted a second relocation program as another vehicle to pilfer funds from Tyco (the "Florida Plan").

62.     The September 8-K summarizes Kozlowski's unauthorized borrowing from the Company as follows:

    a.     $7,011,669 in interest free loans for purported New York relocations that did not qualify under the New York Plan;

    b.     $29,756,110 in interest free loans for the acquisition of property under the unauthorized Florida Plan; and

    c.     $24,922,849 in interest free loans for the acquisitions of other properties that were not authorized by any relocation program.

63.     Of that total amount of $61,690,628 in unauthorized interest free "relocation" loans, Kozlowski: repaid $21,697,303 without interest; bestowed $19,439,392 in authorized loan forgiveness upon himself; and reclassified $20,553,933 to other loan accounts maintained by him with the Company.

64.     According to the September 8-K, Swartz took the following illegal loans:

    a.     $7,668,750 in interest free loans for property acquisitions in New York and New Hampshire in March of 1996 under the unauthorized New York Plan;

    b.     $20,992,000 in interest free loans under the unauthorized Florida Plan between 1997 and 2000; and

    c.     $4,437,175 in interest-free loans for the acquisition of other properties that were not authorized by any relocation program.

65.     Of the $33,097,925 in unauthorized, interest free relocation loans obtained by Swartz, $10,786,977 was repaid by him without interest, $9,792,000 was repaid through loan

"forgiveness" that Kozlowski was not authorized to bestow, and $12,518,948 was reclassified

to other loan accounts that Swartz maintained with the Company.

66.     According to the September 8-K, Belnick also used the unauthorized version of

the New York Plan to borrow approximately $4,217,000 from September 1998 through May

2001 for the purchase and improvement of a cooperative apartment in New York City. Belnick

claimed those benefits under the New York Plan although he lived less than 50 miles from the

address of his new apartment and his prior employer was located in New York City (factors

that disqualified him from participating in any Tyco relocation program). Belnick also

improperly used the unauthorized relocation program to pay his rent for several months while

his new apartment was being renovated.

67.     In 2001 and 2002, Belnick incurred an additional $10,418,599 in "relocation"

debt to purchase land and build a chalet in the ski resort community of Park City, Utah.

Belnick then charged Tyco $1,600 per month for his home office located in that house

although Tyco maintains no corporate offices in Utah, and Tyco had not requested that Belnick

relocate to Utah.

68.     Furthermore, in a complaint filed by Tyco against Belnick in federal court (the

"Belnick Complaint"), the Company states:

> Tyco never adopted a relocation program to Utah. Second, Tyco has no offices
> in Utah to which Belnick could be said to be relocating . . ., Belnick did not
> even execute the various documents called for by the Company's legitimate
> relocation plans, and there is no corporate document that even arguably purports
> to authorize Belnick's Utah loan. In fact, the only documentation of the loan is
> a series of promissory notes, signed only by Belnick, which total over $10
> million.

69.     Because the loans made to Kozlowski, Swartz and Belnick did not qualify under

the authorized relocation plan, these loans were required to be disclosed as compensation in the

18

Company's proxies.  Nevertheless, like the unauthorized loans taken by Kozlowski and Swartz, Belnick's massive borrowing was never disclosed to the Company's investors.

70.     Furthermore, Defendants' abuse of Tyco's relocation loan programs extended into the ranks of the Company's mid-level managers. According to an 8-K filed with the SEC on December 30, 2002 (the "December 8-K"), as of June 30, 2002, there was $3.8 million in loans to Tyco "segment level" managers outstanding under Tyco's relocation program.  Of that amount, $3.2 million, or 84% of the total outstanding loans under the relocation programs, did not conform to the requirements of the loan programs.

### b.     Defendants' Failure To Disclose The Unauthorized TyCom Loan Forgiveness Plan

71.     The Officer Defendants engaged in a number of additional unlawful schemes designed to eliminate much of the interest-free debt they assumed.

72.     One such unlawful scheme introduced by the Officer Defendants involved the initial public offering ("IPO") of Tyco's TyCom subsidiary in September 2000 (the "TyCom Bonus Scheme").

73.     In early September 2000, Kozlowski falsely informed Patricia Prue, Tyco's Senior VP of Human Resources that, in addition to cash and share bonuses for the successful completion of the TyCom IPO, the Board had decided to forgive all of the relocation loans made to the Tyco employees who had relocated to Florida in 1998.  Kozlowski falsely represented that the Board agreed to "gross-up" the benefits, making each employee whole on an after-tax basis for the forgiveness of the loans.  In effect, he falsely represented that the Company would both forgive the loans and pay all income taxes associated therewith.

74.     When Prue requested a memorandum for her files documenting those purported Board decisions, Kozlowski provided her and Swartz (her direct supervisor) with a memorandum from Kozlowski that indicated that "a decision [had] been made to forgive the relocation loans

for those individuals ... whose efforts were instrumental to successfully completing the TyCom IPO."

75.    As a result of this conduct, which the September 8-K states was not authorized by the Tyco Compensation Committee, $56,415,037 in loan forgiveness was provided to 51 Tyco employees. Including the "gross-up" benefits that Kozlowski stated had been authorized, the TyCom Bonus Scheme cost Tyco $95,962,000. Of that amount, Kozlowski received $32,976,000 and Swartz received $16,611,000.

76.    In an effort to conceal his unlawful conduct from investors, Kozlowski also directed the Human Resources executive to obtain confidentiality agreements from each of the employees who benefitted from the TyCom loan forgiveness plan providing that the breach thereof would result in forfeiture of the award. The purported justification for those agreements was that morale would be diminished if information about this generous benefit were made available to the public.

77.    Normally, executive compensation would have appeared in Tyco's financial statements as part of the Company's selling, general and administrative ("SG&A") expenses. Tyco, however, accounted for the TyCom bonus in three different accounts totaling $97.4 million.

78.    Approximately, $44.6 million of the total was incorrectly booked as part of the TyCom offering expense, and the remaining $52.8 million was not counted as an expense at all. Rather, Tyco hid that sum in two reserve accounts that had been previously established on the Company's balance sheet for unrelated purposes. The majority of the funds, $41 million, was booked against "Accrued Federal Income Tax," in effect reducing sums that Tyco had put aside to pay its federal corporate taxes. The remainder of the bonus payments, approximately $11.8 million, was offset against a balance sheet account called "Accrued G&A Expenses," an

account intended to offset previous over-accruals of General and Administrative Expenses. Defendants' distribution of these payments to various places in the balance sheet demonstrates their intention to conceal those payments.

79.     By hiding the TyCom payments in this manner, Defendants also made it impossible for Plaintiff and other investors to determine that enormous bonuses, in the form of loan forgiveness, had been paid. In addition, by disguising the bonuses as "non-recurring charges," Defendants were able to inflate Tyco's earnings before non-recurring charges, a primary measure by which Tyco's financial performance was gauged by investors.

80.     In a September 30, 2002, an article in *The Wall Street Journal* discussed the TyCom bonus payments, and a number of leading accounting experts commented upon the obvious impropriety of the accounting treatment Tyco adopted for the bonuses.

81.     For example, Charles Mulford, an accounting professor at Georgia Institute of Technology, stated, "This looks like blatant misstatement of both the income statement and the balance sheet." Mulford noted that Defendants' maneuvers improperly inflated Tyco's pretax income by $52.8 million in the fourth quarter of fiscal 2000. He also called Defendants' recording of the expense in the income tax reserve account particularly "egregious," and said "it would be very surprising if it wasn't picked up by the auditors."

82.     Those sentiments were echoed by Lynn Turner, the former Chief Accountant at the SEC. According to Turner, the TyCom Bonus Scheme was particularly obvious because auditors typically look closely at such items as tax accounts and big one-time gains and, thus, should have spotted the bonus payments easily because of their highly suspicious nature. In the October 14, 2002, issue of *Business Week*, Turner was quoted as stating, "I can't understand how they missed that one." Likewise, in the September 30, 2002 edition of *The Wall Street*

*Journal* an article was published quoting Turner as stating, "[T]his is called fraud... How the hell do you do that and not have PricewaterhouseCoopers find it?"

83.     The September 8-K also notes that "[a]ll of the forgiveness benefits were individually reported on separate W-2s, yet none of the income associated with the forgiveness benefits was reported in the Company's proxies."

84.     Thus, again, Defendants failed to disclose the compensation paid to Kozlowski, Swartz and Belnick, information that Defendants were required to publicly report.

### c.     Defendants' Failure To Disclose The Unauthorized ADT Automotive Bonuses

85.     During the first quarter of Tyco's fiscal 2001 — just a few weeks after implementing the unauthorized TyCom Bonus Scheme – Kozlowski provided 16 of the Company's executives with additional bonuses and "relocation" payments as a purported result of their contributions to the successful divestiture of Tyco's ADT Automotive business (the "ADT Scheme").

86.     Each of the recipients of the purported relocation benefits had already recovered all of the grossed-up costs associated with their supposed relocations as part of the nearly $100 million unauthorized TyCom Bonus Scheme.

87.     The totals of the additional ADT cash bonuses and "relocation" benefits were $3,979,000 and $32,009,641, respectively.

88.     Kozlowski and Swartz each received millions of dollars at the time of the distribution of the unauthorized ADT payments.

89.     Kozlowski and Swartz also directed that those costs be offset against the unrelated gain accrued by Tyco on the disposition of the ADT Automotive business.  Again, that accounting treatment was improper.  The Defendants knew or recklessly disregarded the improper entries on Tyco's financial statements.

90.    The unauthorized benefits paid in connection with the ADT Scheme were individually reported on certain of the Individual Defendants' 2000 W-2s. None of these benefits were disclosed to Tyco's investors, however.

### d.    Defendants' Failure To Disclose The Flag Telecom Compensation

91.    On June 22, 2001, Tyco acquired 15 million shares of Flag Telecom Holdings Ltd. ("Flag") a telecom company, for $11,421,810 in cash and 5,580,647 TyCom shares (the "Flag Scheme").

92.    Kozlowski and Swartz manipulated this transaction to concoct illicit payments and hid this compensation from the public.

93.    As reported by *The New York Times* on September 25, 2002:

> [Tyco] claimed a profit on an investment even as the company lost money on it, a review of the transaction shows. Tyco then used that profit as an excuse to pay almost $24 million in bonuses to top managers.
>
> Most of that went to L. Dennis Kozlowski, the former chief executive, and Mark H. Swartz, the former chief financial officer.
>
> ***
>
> The transaction appears to have provided a clear economic loss for Tyco, which was forced to pay an above-market price for an 11 percent stake in a small company called Flag Telecom that has since gone bankrupt.
>
> But Tyco disclosed last week that the company had managed to claim a profit of $79.4 million on the transaction, and that this profit was used to justify the bonuses.
>
> ***
>
> The Flag transaction, however, may indicate that the company reported profits improperly, or at least in a way that bore no resemblance to economic reality, and that the executives collected bonuses based on those so-called profits.
>
> To justify the profits reported, Tyco apparently assumed that stock it obtained was worth what it had paid -- something that was clearly not the case at the time -- and then exaggerated that value by using outdated valuation figures. A result was that Flag's value was overstated by 53 percent when the transaction closed.

\*\*\*

Under the transaction, announced on June 20, 2001, Verizon sold 15 million shares in Flag, worth $74.4 million when the deal closed on June 22, to Tyco.

Tyco paid $11.4 million in cash and 5.6 million shares of TyCom. At the June 22 price, those shares were worth $89.3 million, for a total compensation of $100.7 million. A simple subtraction of the two values would indicate that, economically, Tyco had a loss of $26.3 million -- hardly a reason to grant bonuses.

\*\*\*

In Tyco's financial statements for the quarter ended last June, the company disclosed a profit of $64.1 million on the sale of stock in an unnamed subsidiary, which Tyco officials confirmed yesterday was TyCom. The Boies report said the company actually computed a profit of $79.4 million. It appears the difference related to hiding the value of $15.4 million in compensation expenses reflected in the bonuses the executives were paid. By reducing the stated profit, the company could also avoid reporting the compensation costs without affecting the reported income numbers.

\*\*\*

On paper, those bonuses were paid when the company gave stock to the executives and then bought it back from them. The Boies report said most of the sales were made on June 20, the day the Flag deal was announced and two days before it closed, so eager were the executives to get their cash. The remaining sales of stock by Mr. Kozlowski and Mr. Swartz were made two weeks later. All told, their bonuses on the deal totaled $20.4 million.

\*\*\*

In the end, Flag went bankrupt and Tyco wrote off its entire investment, which it valued at $114 million -- a value of $7.60 per share of Flag stock. But Flag shares were worth only $4.61 on June 20, when the deal was announced, and $4.96 on the day it closed. Had either of those values been used, Tyco's reported profits would have been far lower.

\*\*\*

The deal was a fiasco for Tyco.

\*\*\*

But if Tyco suffered from the transaction, it was just one more bonanza for Mr. Kozlowski and Mr. Swartz, who were able to get millions in a way that would not be reported as compensation.

24

94.     In the Complaint that Tyco filed against Kozlowski in federal court (the

"Kozlowski Complaint"), the Company provided the following damning summary of the

TyCom, ADT Automotive and Flag bonus schemes employed by Kozlowski and Swartz to loot

Tyco:

> The combined cost of these unauthorized "special bonus" programs – Tycom
> Forgiveness   Program   ($95,962,653),   the   ADT   Automotive   Bonus
> ($55,954,455), and Flag Vesting ($15,378,700) – cost the Company over
> $167,295,808. None of these programs was properly approved by the Board or
> its Compensation Committee. The net benefit from these combined programs
> accrued overwhelmingly to Kozlowski and permitted him to realize more than
> $66,760,551 in undisclosed income in less than twelve months.

95.     None of the benefits paid to Swartz and Kozlowski pursuant to the unlawful

Flag Scheme were disclosed to Plaintiff.

### e.     Defendants' Failure to Disclose the "KEL" Loans As Compensation

96.     Kozlowski and the other Officer Defendants abused a Tyco KEL Program

that was intended to encourage ownership of Tyco common shares by executive officers and

other key employees. The program was intended to provide KEL loans on favorable terms so

that officers would pay taxes due upon the vesting of shares granted under Tyco's restricted

share ownership plan without having to sell the shares at the time of vesting to pay the

resultant tax liability.

97.     According to the September 8-K, starting no later than 1997, the Officer

Defendants "used KEL loans for purposes other than the payment of taxes due upon the

vesting of restricted shares, borrowed more than the limits allowed under the program's terms, or

both."

98.     The September 8-K also acknowledges that Kozlowski "borrowed funds for

purposes other than those stated in the KEL program and used the KEL program like an

unlimited line of credit. In addition to taking non-program loans, Kozlowski borrowed in excess

of the KEL program's limits." Testimony given at the Kozlowski trial also revealed that among other improper purposes, Kozlowski used KEL loans to buy jewelry, to finance an $8.3 million interest in the New York Yankees and the New Jersey Nets, to buy a $250,000 Ferrari.

99.   As was revealed in the September 8-K, by August of 1999, Kozlowski had taken $55.9 million in KEL loans, 90% of which did not satisfy the program's criteria. By June 30, 2002, Kozlowski's balance in unauthorized KEL loans was approximately $43,841,000, plus accrued interest.

100.   The September 8-K summarizes Kozlowski's unlawful abuse of the KEL program as follows:

> Because Mr. Kozlowski generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter - thus violating both the spirit and the letter of the KEL program), all of his loans are now due and payable. As described above, Mr. Kozlowski was indicted on September 12, 2002 for using the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. Mr. Kozlowski's total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of June 30, 2002, was approximately $43,841,000, plus accrued interest.

101.   Swartz also took tens of millions of dollars in unauthorized KEL loans. In a complaint filed by the SEC against Swartz in federal court (the "SEC Complaint"), the SEC alleged (based upon documentation provided by Tyco) that Swartz took $85 million in KEL loans between 1997 and 2002. He only utilized $13 million of that amount for the sole authorized purpose of KEL loans - paying taxes owed upon the vesting of restricted shares of Tyco stock.

102.   Furthermore, Tyco acknowledged in the September 8-K that, as Tyco's CFO, Swartz "was responsible for approving and monitoring the KEL loans of senior management, including Mr. Kozlowski's KEL loans. As such, he was aware of the nature and extent of Mr. Kozlowski's loans."

103.    The September 8-K summarizes Swartz's abuse of the KEL program as follows:

Mr. Swartz also generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter - thus violating both the spirit and the letter of the KEL program. As described above, Mr. Swartz was indicted on September 12, 2002 for conspiring with Mr. Kozlowski to use the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. Mr. Swartz's total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of July 18, 2002 was approximately $2,853,025, plus accrued interest.

104.    In August 1999, at the direction of Kozlowski and Swartz, entries were made in Tyco's KEL records that purported to reduce $25,000,000 of Kozlowski's outstanding KEL indebtedness, $12,500,000 of Swartz's KEL indebtedness, and $1,000,000 of the KEL indebtedness of another Tyco employee.

105.    Tyco has conceded that Belnick was aware of Kozlowski's abuse of the KEL loan program. According to Tyco, Belnick personally approved language in Tyco's SEC filings that gave varying descriptions of how the KEL loan program was being used by Kozlowski without disclosing Kozlowski's abuse of that program. In addition, the September 8-K reveals that, during the week of June 3-7, 2002, Belnick agreed that it was wrong for Kozlowski to use the KEL program for purposes other than to facilitate his retention of Tyco restricted shares.

106.    Defendants never disclosed the Officer Defendants' abuses of Tyco's KEL programs to investors as they were required to do.

### f.    Defendants' Failure to Disclose Belnick's Compensation

107.    Defendant Belnick also received a number of forms of compensation that were improperly concealed from the investing public, including Plaintiff.

108.    SEC rules require companies to disclose in their Proxy Statements the compensation of their CEOs and their four highest-paid executive officers. The determination of who are the four highest-paid executive officers is made by reference to total annual salary and bonus, not other forms of remuneration. For this purpose, SEC rules allow a company in

limited circumstances not to count the distribution or accrual of a large amount of cash compensation (such as a bonus) that is not part of a recurring arrangement and which is unlikely to continue.

109.    On August 19, 1998 (a month before Belnick began working at Tyco), Kozlowski sent Belnick a letter describing Belnick's proposed compensation. The letter represented to be the agreement with Belnick, described Belnick's cash compensation as: (1) a base salary of $700,000 per year; (2) a sign-on bonus of $300,000; and (3) a guarantee cash bonus of $1,500,000 the first year; $1,000,000 the second year; and $1,000,000 the third year, with your first bonus payable with our fiscal year end September 30, 1999.

110.    The letter agreement also entitled Belnick to 100,000 restricted Tyco shares (with a then-market value of over $5 million), vesting over three years, and 500,000 options (with a then fair market value in the millions), also vesting over three years.

111.    On the date that agreement was reached, however, Belnick and Kozlowski executed another agreement that was far more generous to Belnick that assured Belnick that "in any event, your annual cash bonus will not be less than 1/3 of mine" and also included two additional paragraphs not in the version of the letter represented to the Tyco personnel department to be the agreement with Belnick. Those paragraphs provided:

> You will also be entitled to participate in and benefit from (proportionate to your position) all existing and future benefit plans and programs that are available for senior executive officers of the Company. Accordingly, among other benefits, you will be entitled to participation in Tyco's relocation program to New York City, participation in the Company's 401 (k) Plan, the use of a car and either a Company loan or a re-load of restricted shares in connection with your tax liability on the same of previously restricted shares.

> If for any reason the relationship does not work out to your or the Company's satisfaction and you leave the Company prior to September 30, 2001, the Company will pay you until then your base salary and guaranteed cash bonuses, less the sign-on bonus, (regardless of your income or earnings from other employment). You would also retain in full the sign-on bonus, restricted shares (whether or not still restricted) and your stock options.

112.    According to the September 8-K, the terms of Belnick's undisclosed compensation agreements with Kozlowski allowed Belnick to receive the following compensation in 1999, 2000 and 2001:

a.    1999 - $700,000 base salary, $1,500,000 guaranteed bonus, $179,990 in loan interest forgiveness, $3,388,258 in restricted stock vesting and $1,906,799 in proceeds from the exercise of stock options (of a total of 1,000,000 options granted) for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised stock options) of $6,916,004;

b.    2000 - $750,000 base salary, $2,000,000 guaranteed bonus (though $1,000,000 was reclassified as a "special bonus"), $2,000,000 in another "special bonus," $231,445 in loan interest forgiveness, $197,485 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness, $6,035,803 in restricted stock vesting, and new options to purchase 200,000 shares of stock for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised stock options) of $10,442,331;

c.    2001 - $762,500 base salary, $50,000 in an undefined "special bonus," $300,010 in loan interest forgiveness, $255,420 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness, $15,592,042 in restricted stock vesting, and options to purchase 200,000 shares of stock for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised options) of $16,973,344.

113.    Because Belnick's 2000 compensation made him one of the Company's four-highest paid executives other than Kozlowski, Tyco was obligated to disclose that compensation in the Company's 2001 Proxy Statement and other SEC filings. In conjunction

with the other Defendants, however, Belnick conspired to and avoided making those required disclosures.

114.    According to the September 8-K, Belnick's efforts to conceal his compensation required the manipulation of the bonus income that he received from the Company in 2000.

115.    According to Tyco, in April of 2000, Belnick demanded and received 100,000 shares of restricted stock and, in July of that year, Belnick demanded and received a $2 million "special bonus" for his role in bringing about the conclusion of an SEC investigation of Tyco's accounting policies. That special bonus was separate and apart from the $2 million annual bonus that Belnick and Kozlowski had agreed upon. In addition, Kozlowski awarded Belnick an additional 200,000 shares of restricted stock.

116.    Even standing alone, the $2 million guaranteed minimum annual bonus would have required Belnick's compensation to be disclosed. Nevertheless, Belnick repeatedly caused Tyco to make filings with the SEC that did not disclose significant portions of the compensation that he received from Tyco. In addition, Belnick made enormous sales of Tyco stock without disclosing that he was receiving large amounts of unauthorized compensation from Tyco.

117.    Belnick sought to conceal his actual compensation by causing Tyco's HR department to record his 2000 bonuses as being comprised of $3 million in special bonuses, and only a $1 million guaranteed bonus. In particular, Belnick caused $1 million of the purported $2 million guaranteed bonus to be characterized as a special bonus related to a transaction with TyCom. As a result of that reclassification, $3 million of the bonus income received by Belnick was considered non-recurring and was therefore excluded from the computation of Tyco's four highest-paid executives, dropping Belnick out of that category.

118.    According to testimony at Belnick's criminal trial, the bonus demanded and received by Belnick in connection with his role in diverting the SEC's inquiry of Tyco in 2000 totaled approximately $17 million.  Testimony at Belnick's trial suggests that Belnick received the payment to keep quiet concerning Kozlowski's improper diversion of Tyco funds to his girlfriend, family members and others.

119.    None of the foregoing facts concerning Belnick's compensation was disclosed to Plaintiff as was required under law.

### g.    Defendants' Failure To Disclose The Belnick Retention Agreement

120.    The Tyco Defendants also failed to disclose to Tyco shareholders the material circumstances surrounding the "Retention Agreement" that Belnick drafted for himself in late 2001. That agreement provided for Belnick to receive a further payment by October 1, 2003 of approximately $20 million ($10.6 million plus a "gross-up" for taxes) even if he were discharged for intentional misconduct.

121.    According to Tyco, in February 2002, weeks after the Retention Agreement had been agreed to and executed, a proposal for such an agreement was purportedly reported for the first time to the Compensation Committee, at a meeting attended by Patricia Prue, the head of Tyco's Human Resources department.  During the course of the meeting, a "Term Sheet" was presented to the Compensation Committee purporting to summarize the principal terms of Belnick's new agreement.

122.    The terms that were omitted from that Term Sheet were equally as important as those set forth in the document.  According to Tyco, neither by means of the Term Sheet nor any other communication was the Compensation Committee informed that the Retention Agreement had already been executed and that it purported to provide for multi-million dollar

payments to Belnick, even if he were fired for an intentional breach of his duties to the Company.

123. What was included in the Term Sheet was also misleading. According to Tyco, for example, the Term Sheet represented that the retention "payment is in lieu of bonuses," without revealing the huge undisclosed bonuses Belnick had just received in 2000.

124. According to Tyco, as Tyco's Chief Corporate Counsel, Belnick was aware that the Compensation Committee was responsible for conducting a review of compensation, "including salary, bonus, equity plan awards, and prerequisites" for all executives and those senior officers reporting directly to Kozlowski. Especially for these reasons, Belnick had a duty to inform the Compensation Committee of the magnitude of his undisclosed prior compensation.

125. According to Tyco, after review by Tyco's outside counsel concerning benefits and employment matters, Belnick's executed Retention Agreement was revised to add some basic terms for that type of agreement. The essential economic terms of the agreement were never changed, however, and neither the Board nor the Compensation Committee ever sought or received any independent advice as to the reasonableness of those terms.

126. Because the Retention Agreement was a material agreement for Tyco, it was set forth as an Exhibit to the Company's Form 10-Q for the quarter ended March 31, 2002 (the "May 2002 10-Q"). The Retention Agreement failed to disclose that Belnick had received a bonus during fiscal 2001 and that he received a $9.4 million "gross-up" for taxes. As a matter of law, the Tyco Defendants were obligated to disclose Belnick's true compensation to investors.

32

### h.   Defendants' Failure To Disclose The Additional Unlawful Compensation Paid To Kozlowski And Swartz By Tyco

127.   Kozlowski engaged in a number of other undisclosed real estate-related scams through which he enriched himself at the expense of Tyco shareholders.

128.   In particular, the September 8-K and the Kozlowski Complaint acknowledge that Defendants improperly failed to disclose that Kozlowski:

a.   arranged for Tyco to rent for him, at Tyco's expense, a Manhattan apartment with annual rent of $264,000 from 1997 to 2001;

b.   purchased, using interest-free relocation loans, a $7 million Tyco-owned apartment on Park Avenue in Manhattan without any appraisal at depreciated book value (which was well below market value) and then deeded the apartment to his ex-wife a few months later;

c.   sold his New Hampshire house to the Company in 2000 without appraisals for $4.5 million, an amount approximately three times its market value (less than 24 months later, the Company wrote down this asset by approximately $3 million);

d.   sold a home in North Hampton, New Hampshire to the Company in 2000 and then continued to make personal use of the property by permitting his ex-wife to reside there for two years, without a lease or without even reimbursement to the Company of expenses;

e.   caused Tyco to purchase a second Manhattan apartment for his use for $16.8 million, and then caused Tyco to spend $3 million in improvements and $11 million in furnishings for that apartment (including a $6,000 shower curtain, a $15,000 dog umbrella stand, a $6,300 sewing basket, a $17,100 traveling toilette box, a $2,200 gilt metal wastebasket, coat hangers for $2,900, two sets of sheets for $5,960, a $1,650 notebook, a $445 pincushion, a $38,000 backgammon table, a $125,000 pair of antique stools, a $103,000 mirror, and a $2665 custom pillow);

f.      furnished a home that he owned in New Castle, New Hampshire, at a cost of $269,000, which he expensed to the Company although he thereafter made exclusive use of the property, while charging the maintenance costs to the Company;

g.      purchased a home in Rye, New Hampshire with Company funds that he later reimbursed and then made personal use of the property, while expensing its maintenance to the Company;

h.      purchased a home in Boca Raton with the Company's money and then made personal use of the property for himself and visiting family members;

i.      caused Tyco's Fire & Security unit to spend $110,000 on hotel accommodations for him during one 13-day stay in London;

j.      caused Tyco's Fire and Security unit to employ his personal assistant in London and provide her with an apartment, maintenance expenses and other benefits from May 2001 to July 2002; and

k.      caused TyCom to employ a person whose primary duties related to Kozlowski's yacht from December 1999 to July 2000.

129.    Testimony at the Kozlowski trial also revealed that Kozlowski and Swartz caused Tyco to buy out their $300,000 investments in Bonta, a New Hampshire restaurant, when those investments proved unprofitable. Kozlowski also caused Tyco to invest $400,000 in the New York City restaurant Soho to serve his personal interests.

130.    Furthermore, none of the Defendants disclosed that, as is conceded in the September 8-K and the Kozlowski Complaint, Kozlowski received "gross-up" benefits to avoid having to pay any state income tax liability incurred after relocating to New York.

131.    In sum, according to the September 8-K and the Kozlowski Complaint, Kozlowski:

34

a.      misappropriated for himself over $100 million that he was not authorized to receive;

b.      "wrongfully divert[ed] to others millions of dollars in cash and stock, used to induce their cooperation or buy their silence";

c.      caused Tyco executives to receive $95,962,653 in connection with the unapproved TyCom loan forgiveness, of which $79,177,081 represented senior executive benefits Kozlowski allegedly awarded without obtaining requisite Board approvals;

d.      provided himself with $17,188,034 and 148,000 shares of Tyco stock in connection with the unauthorized ADT Scheme;

e.      caused the Company to pay a total of $36,584,338 and to issue a total of 261,500 shares of Tyco stock in connection with the ADT Scheme, of which $34,822,412 and 259,500 shares represent senior executive benefits Kozlowski allegedly awarded without obtaining the requisite Board approvals;

f.      provided himself with $8,219,650 in connection with the unauthorized Flag bonuses;

g.      caused the Company to pay $15,378,700 in connection with that unauthorized bonus program; and

h.      misappropriated tens of millions of dollars in Company funds that were charged as purported business expenses, including at least $20,000,000 for artwork, antiques and furnishings; $700,000 to finance the movie "Endurance"; one-half of the $2.1 million expense of a week-long birthday party for his wife in Sardinia although the "business" purpose for traveling to Sardinia was nothing more than a meeting of a Tyco subsidiary that could have been held anywhere; $110,000 for use of his yacht; $1,144,000 for jewelry, clothing, flowers,

club memberships, wines and private ventures; and $150,000 for personal expenses at 59 Harbor Rd., Rye, New Hampshire from 1996 to 2002.

132.    Kozlowski also took personal credit in transmittal letters or otherwise used Company funds for his personal benefit in connection with donations to charitable organizations totaling $43 million.

133.    Kozlowski donated to the Nantucket Conservation Foundation, Inc. a total of $1,300,000 in Tyco funds. That sum was used partially to purchase 60 acres of property called "Squam Swamp" adjacent to Kozlowski's own Nantucket estate. The effect of this gift was to preclude future development of the land and thereby increase the value of Kozlowski's home.

134.    Contrary to Kozlowski's spending spree with funds he misappropriated from Tyco, a May 28, 2001 *Business Week* article lauded Tyco as the "leanest operation in corporate America."

135.    Like Kozlowski, Swartz engaged in a variety of additional undisclosed related party transactions designed to enrich him at the expense of Tyco.  On March 1, 2002, purportedly without approval by the Compensation Committee or the Board, Swartz caused Tyco to pay him a reimbursement of $1.2 million to cover lost deposits on personal real estate transactions involving apartments in the Trump Tower on 5th Avenue in Manhattan.

136.    Since April 2000, Swartz lived in a Tyco-owned apartment on the Upper East Side of Manhattan.  On May 6, 2002, Swartz caused Tyco to enter a notation in its books and records purporting to transfer to him ownership of that apartment, including its fixtures and furniture, at its depreciated book value of $9,646,975.  No appraisal was performed in connection with that supposed transfer.

137.    On July 18, 2002 (i.e., after Kozlowski had resigned), Swartz agreed to reverse that transaction, and his KEL account was credited $9,646,975 to reflect the reversal.

138.    Again, none of the foregoing additional compensation paid to Kozlowski and Swartz was disclosed to Plaintiff. Defendants' disclosures concerning the Officer Defendants' compensation were therefore materially misleading for this additional reason.

### 3.    Defendants' Affirmative Misrepresentations Concerning The Officer Defendants' Compensation

139.    In addition, Defendants' were required to disclose compensation paid to the Individual Defendants because they made affirmative statements regarding compensation. Once such statements were made, a duty to disclose was imposed, a duty that Defendants failed to abide by.

### a.    Defendants' Representations Concerning The Officer Defendants' Compensation For The Period Ended September 30, 1999

140.    On February 1, 2000, Tyco filed with the SEC Amendment No. 2 on Form 10-K/A to Tyco's Form 10-K for the fiscal year ended September 30, 1999 (the "1999 10-K Amendment"). The 1999 10-K Amendment was signed by defendant Swartz.

The 1999 10-K Amendment contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to the Company and its subsidiaries for the Chief Executive Officer of the Company and the other four most highly compensated executive officers of the Company during fiscal 1999." However, the 1999 10-K Amendment failed to disclose the actual compensation paid to Kozlowski and Swartz during Tyco's 1999 fiscal year end.

141.    On March 1, 2000, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders, which was scheduled for April 19, 2000 (the "2000 Proxy"). Portions of the 2000 Proxy were signed by defendant Kozlowski. The 2000 Proxy contained the same or similar information concerning the Officer Defendants' reported compensation as the 1999 10-K Amendment.

37

142.    The 2000 Proxy Statement also set forth a description of Kozlowski's compensation and described the KEL program but failed to disclose the unauthorized loans provided to Kozlowski under the KEL program.

143.    Moreover, in a February 1, 2000 *Wall Street Journal* article, a Tyco spokesperson stated that the $139.7 million that Kozlowski realized from exercising 6.3 million Tyco stock options during Tyco's fiscal 1999 was utilized to repay loans to Tyco that were taken to pay taxes on restricted stock Kozlowski had received and to pay taxes on exercised options. As is specifically alleged herein, Defendants failed to disclose that Kozlowski and Swartz ignored the stated purposes of the KEL program by borrowing from the Company to fund their personal expenditures, rather than to fund taxes owed in connection with the vesting of Tyco restricted shares.

144.    The 2000 Proxy also contained a "Board Compensation Committee Report on Executive Compensation." That report, which was submitted by the members of the Tyco Board of Directors Compensation Committee (defendant Walsh and fellow directors Stephen W. Foss, Philip M. Hampton and W. Peter Slusser) stated that "[t]he Compensation Committee of the Board of Directors approves all of the policies under which compensation is paid or awarded to the Company's executive officers and key managers and oversees the administration of executive compensation programs."

145.    As is specifically alleged herein, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. Accordingly, the foregoing description of the Compensation Committee's role in determining the compensation paid to Kozlowski and Swartz failed to disclose that certain of the Officer Defendants were able to and did set compensation levels without approval from the Compensation Committee.

146.    On or about December 13, 1999, Tyco filed with the SEC a Form 10-K annual report for the fiscal year ending September 30, 1999 (the "1999 10-K"). The 1999 10-K was signed by defendants Kozlowski, Swartz and Walsh. Under the heading "Management Remuneration," the 1999 10-K incorporated by reference the information concerning management compensation contained in the 2000 Proxy. The 1999 10-K therefore failed to disclose the compensation information alleged herein.

147.    In addition, with respect to the Company's KEL Program, the 1999 10-K stated, "During Fiscal 1999, the maximum amount outstanding under the program was $91.6 million."

148.    All of these representations regarding the KEL Program and the compensation received by Kozlowski and Swartz failed to disclose the Individual Defendants' abuse of the KEL program and the fact that the vast majority of the loans extended pursuant to that program did not comply with its stated purpose.

### b.    Defendants' Representations Concerning The Officer Defendants' Compensation for the Period Ended September 30, 2000

149.    On January 29, 2001, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders, which was scheduled for March 27, 2001 (the "2001 Proxy"). Portions of the 2001 Proxy were signed by defendant Kozlowski.

150.    The 2001 Proxy contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to Tyco and its subsidiaries for the periods shown for Tyco's Chief Executive Officer and the other four most highly compensated executive officers of Tyco during fiscal 2000."

151.    The 2001 Proxy Statement also provided information regarding the compensation paid to Kozlowski:

For fiscal 2000, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000. These shares will vest over a period of up to three years if the specified performance criteria referred to above are met.

Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures (described in footnote 3 on page 16). Mr. Kozlowski also received restoration options in accordance with the restoration option provision. The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco. At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years. The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski. The Committee conferred with a nationally recognized consulting firm that analyzed Tyco's performance, as well as the marketplace for executive talent. The firm reviewed the performance option award, designed to focus on Mr. Kozlowski's retention as well as growth in shareholder value, and made its recommendations. Another consulting firm reviewed and concurred with the recommendations.

The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000. As noted above, Tyco experienced outstanding growth in earnings per share of 42.5%, operating cash flow of 48.6%, and net sales of 29%.

152.   However, the 2001 Proxy failed to disclose: (a) the actual compensation paid to Kozlowski and Swartz during Tyco's fiscal 2000 materially exceeded the disclosed amounts; and (b) the compensation paid to defendant Belnick during Tyco's fiscal 2000.

153.   On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report"). With respect to the KEL program, the 2000 Annual Report misleadingly stated, "During Fiscal 2000, the maximum amount outstanding under the program was $26.0 million. Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively."

154.   As specifically alleged herein, the foregoing disclosures concerning the KEL program failed to include the fact that Kozlowski and Swartz ignored the stated purposes of the KEL program by borrowing from the Company to fund their personal expenditures, rather than to fund their purchases of Tyco shares.

155.   The 2001 Proxy also contained a "Board Compensation Committee Report on Executive Compensation." Among other things, that Report stated:

A.   ... The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and oversees the administration of executive compensation programs.

B.   In formulating the policies under which Tyco's executives were compensated, the Committee considers the following factors, among others:

> - Company growth and ultimately shareholder value are best served by having incentive compensation based on the financial performance of the Company and its various operating companies with a large component based on increase in the value of Tyco shares.
>
> - The compensation paid by Tyco to its management team should be competitive with executive compensation of other similarly situated public companies. The Committee retains an independent outside consulting firm to evaluate the appropriateness of Tyco's executive pay practices.

C.   At the end of each fiscal year, the Compensation Committee reviews with the Chief Executive Officer the individual performance of each of the other executive officers and reviews his recommendations for the appropriate compensation awards and the financial and other objectives for each of the executive officers for the following year.

D.   The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000.

156.   As is specifically alleged herein, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. The foregoing description of the Compensation Committee's role in determining the

41

compensation paid to Kozlowski, Swartz and Belnick failed to disclose that in the circumstances alleged herein, the Officer Defendants' compensation was not required to go through this approval process.

157.    On or about December 21, 2000, Tyco filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended September 30, 2000 (the "2000 10-K"). The 2000 10-K was signed by Defendants Kozlowski, Swartz and Walsh. Under the heading "Management Remuneration," the 2000 10-K incorporated by reference the information concerning management compensation contained in the 2001 Proxy. The 2000 10-K again failed to disclose the compensation information detailed herein.

### c.    Defendants' Representations Concerning The Officer Defendants' Compensation for the Period Ended September 30, 2001

158.    On January 28, 2002, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders, which was scheduled for February 21, 2002 (the "2002 Proxy"). Portions of the 2002 Proxy were signed by defendant Kozlowski.

159.    The 2002 Proxy contained a table that purportedly represented the "annual and long-term compensation for services in all capacities to Tyco and its subsidiaries for the periods shown for Tyco's Chief Executive Officer and the other four most highly compensated executive officers of Tyco during fiscal 2001."

160.    The 2002 Proxy Statement also contained additional information about Kozlowski's compensation:

> For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a 38.9% increase in Net Income before non-recurring items and a 31.3% increase in Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted 600,000 shares of performance-based restricted stock on October 1, 2001. If the pre-determined specified performance criteria are met,

these shares will vest over a period of up to three years. After three years, any remaining unearned shares will be forfeited and returned to the Company.

Mr. Kozlowski also received restoration options in accordance with the restoration option provision of the Company's option program. The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.

161.    Defendants' description of the compensation paid to the Officer Defendants failed

to disclose: (a) the actual compensation paid to Kozlowski and Swartz, which vastly exceeded

the disclosed amounts; and (b) the compensation paid to defendant Belnick during Tyco's fiscal

2000.

162.    The 2002 Proxy Statement also included statements regarding Tyco's KEL

program, but failed to disclose that Kozlowski and Swartz ignored the stated purposes of the

KEL program by borrowing from the Company to fund their personal expenditures, rather than

to fund their purchases of Tyco shares.

163.    The 2002 Proxy also contained information regarding "Board Compensation

Committee Report on Executive Compensation."  Among other things, that report stated:

A.    ... The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and has oversight of the administration of executive compensation programs. The Compensation Committee reviews the compensation policies in light, among other things, of the competitive environment in which Tyco must compete for superior executive talent and the benefit to the Company and its shareholders of having a large portion of incentive compensation tied to the equity value of the Company.

B.    The elements of Tyco's compensation program for its executives are base salary, annual incentive bonus opportunity, and long-term, equity-based incentive compensation.

C.    During fiscal 2001, the Committee took steps to ensure the continued leadership of the executive management of the Company. In this connection, at the Committee's request and approval, Tyco entered into

retention agreements with L. Dennis Kozlowski, described in the CEO compensation section below, and with Mark H. Swartz.

D.  The Committee retains a nationally recognized consulting firm to review and analyze Tyco's executive compensation practices relative to the Company's performance, as well as the marketplace for executive talent. The Committee also observed that Tyco and Mr. Kozlowski's leadership of Tyco have received many favorable comments from the business and financial community. The Committee noted that Tyco was named the best performing company by BUSINESS WEEK in its Spring 2001 special edition featuring its choice of the 50 best performing companies and that more recently Mr. Kozlowski was named one of the top 25 managers of the year by BUSINESS WEEK in its January 14, 2002 edition. Mr. Kozlowski has led Tyco from a $3 billion manufacturing corporation in 1993 to a $36 billion diversified service and manufacturing corporation in 2001 that has provided 910% in total cumulative shareholder return from 1993 - 2001. In addition, Mr. Kozlowski grew revenue an average of 38% per year from 1993-2001. During Mr. Kozlowski's tenure as Chief Executive Officer, Tyco has consistently enjoyed a strong balance sheet, with debt levels appropriate for a company of its size and scope of operations, and with investment grade ratings that allow the Company efficiently to address and service its capital requirements.

164.  As is specifically alleged herein, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. Accordingly, the foregoing description of the Compensation Committee's role in determining the compensation paid to Kozlowski and Swartz failed to disclose that in certain circumstances, as detailed herein, compensation was not approved in the manner set forth above.

165.  On or about December 28, 2001, Tyco filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended September 30, 2001 (the "2001 10-K"). The 2001 10-K was signed by Defendants Kozlowski, Swartz and Walsh. Under the heading "Executive Compensation," the 2000 10-K incorporated by reference the information concerning management remuneration contained in the 2002 Proxy. The 2001 10-K failed to disclose the hidden compensation detailed herein.

44